<u>NOT FOR PUBLICATION</u>                              [Docket No. 5]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

STEVEN ERLBAUM, et al.,

    Plaintiffs,

        v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
et al.,

    Defendants.

Civil No. 16-8198 (RMB/JS)

**OPINION**

APPEARANCES:

Thomas S. Biemer
Jordan M. Rand
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
    *Attorneys for Plaintiffs Steven Erlbaum, Frank Binswanger,
    Jr., John Turchi, David Boath, Ron Cohen, Patricia Deroo,
    and Kevin Deroo*

Kristina Lee Miles
New Jersey Department of Law & Public Safety, Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625
    *Attorney for State Defendants New Jersey Department of
    Environmental Protection, Commissioner of the New Jersey
    Department of Environmental Protection Bob Martin,
    William Dixon, and David Rosenblatt*

Anne B. Taylor
Office of the U.S. Attorney, District of New Jersey
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ 08101
    *Attorney for Federal Defendants United States Army Corps
    of Engineers, Lieutenant Colonel Michael Bliss,
    Keith Watson, Frank Masters, and Kenneth Goldberg*

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon the Application for an Order to Show Cause Why a Preliminary Injunction Should Not Issue [Docket No. 5] by Plaintiffs Steven Erlbaum, Frank Binswanger, Jr., John Turchi, David Boath, Ron Cohen, and Kevin and Patricia Deroo (collectively, the "Plaintiffs"). Plaintiffs seek an order preliminarily enjoining Defendants New Jersey Department of Environmental Protection ("NJDEP"), Bob Martin in his official capacity as Commissioner of NJDEP, William Dixon in his official capacity as NJDEP's lead engineer and project manager, David Rosenblatt in his official capacity as NJDEP's Manager of the Office of Engineering and Construction (together with NJDEP, the "State Defendants"), the United States Army Corps of Engineers (the "Corps"), Lieutenant Colonel Michael Bliss in his official capacity as Commander of the Philadelphia District of the Corps, Keith Watson in his official capacity as the Corps' lead engineer and project manager, Frank Masters in his official capacity as the Corps' Chief of Civil Works Programs Branch in the Philadelphia District, and Kenneth Goldberg in his official capacity as the Corps' Chief of Programs and Project Management branch in the Philadelphia District (together with the Corps, the "Federal Defendants"), from constructing dunes on the beach in Margate City, New Jersey

("Margate") as part of the Absecon Island Coastal Storm Risk Reduction Project (the "Project").

On December 13, 2016, the Court conducted an evidentiary hearing on Plaintiffs' application. The parties subsequently submitted proposed findings of fact and conclusions of law. For the reasons set forth below, Plaintiffs' application for a preliminary injunction is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Project is a Congressionally-authorized and long-planned project designed to provide shore protection for the municipalities of Absecon Island, including Margate. Watson Decl. ¶¶ 1-6 [Docket No. 17-5]. The Project is comprised of a dune and berm[1] system along the beach. Id. ¶ 5. Its purpose is to reduce the harmful effects of storm surge and wave energy from the Atlantic Ocean, largely caused by storms. Preliminary Injunction Hearing Transcript ("PI Hrg. Tr.") 219:16-220:3 (Watson) [Docket No. 34].

Plaintiffs are seven private property owners who own beachfront homes in Margate. They seek to enjoin the construction of the Project. Third Am. Compl. ¶¶ 5-12 [Docket No. 29]. Plaintiffs claim that the construction of the Project as currently designed will "imped[e] Margate's drainage plan,

---

[1] The berm is the area between the toe of the dune and the ocean.

causing pools of standing water to breed bacteria and disease in addition to creating a safety hazard, and by greatly diminishing the public's ability to access, use and enjoy Margate's beaches." Id. ¶ 76.

### A. Current Conditions in Margate

Margate is a municipality on Absecon Island, a barrier island in New Jersey that stretches approximately eight miles along the Atlantic Ocean and is susceptible to severe damage from coastal storms.  Dixon Decl. ¶ 10 [Docket No. 18-1].

Margate's storm water drainage system relies on the gravitational flow of water from Atlantic Avenue, the high point of elevation in Margate.  Storm water that falls west of Atlantic Avenue generally flows into the bay, while storm water that falls east of Atlantic Avenue generally flows into the Atlantic Ocean, down street-side concrete gutters and onto the beach through holes in the bulkhead called scuppers.  PI Hrg. Tr. 17:20-18:17 (Dutill); 121:13-122:2 (Walberg).  Five streets east of Atlantic Avenue, however, are graded away from the beach, meaning that the water flows towards Atlantic Avenue, is collected in storm capture inlets, and then travels by pipe to the beach.  Four of these five pipes extend one to two feet past the bulkhead.  Id. 122:3-18 (Walberg).

The bulkhead runs along the length of Margate beach, approximately 1.6 miles.  The elevation of sand against the

bulkhead varies greatly, as does the elevation of the scuppers and outfall pipes through which storm water flows to the beach. Id. 139:2-18, 141:15-19 (Walberg).  For example, the outfall pipes are at elevations lower than +4.25 NAVD88.[2]  By one measurement, the lowest outfall pipe is at an elevation between +3.5 and +3.75 NAVD88.  Id. 256:12-21 (Bartles).  The water table in Margate is tidal.  Its elevation generally ranges between -2.0 NAVD88 and +2.5 NAVD88.  Id. 106:6-13 (Walberg); 249:22-250:4, 262:10-14 (Bartles).  The highest water table elevation level is less than +3.0 NAVD88.  Id. 222:6-17 (Watson).

Margate commonly experiences water ponding on the beach side of the bulkhead, which occurs after storm events and sometimes in the absence of storms.  Dutill Decl. ¶ 36; Bartles Decl. ¶ 6 [Docket No. 17-1]; PI Hrg. Tr. 20:1-7 (Dutill); 106:14-17 (Walberg).  Currently, to address storm events during which the ocean is expected to surge up to the bulkhead, Margate blocks the scuppers with sand in order to keep ocean water from flooding through the bulkhead and onto the streets.  This causes

---

[2] NAVD88 is a geodetic datum, an absolute unit of measurement for elevation.  PI Hrg. Tr. 261:4-12 (Bartles).  As explained in further detail herein, the Corps' engineer, Mr. Bartles, used NAVD88 in his studies while it appears that Mr. Dutill, Plaintiffs' expert, used a different measurement, Mean lower low water ("MLLW"), in his analyses.  See PI Hrg. Tr. 261:22-262:1 (Bartles); Dutill Decl. ¶ 34 [Docket No. 5-5].

ponding on the streets of Margate until the ocean has receded and the city officials dig out the scuppers and outfall pipes. PI Hrg. Tr. 122:19-123:5, 127:11-128:2 (Walberg).  For other storm events, Margate facilitates the movement of storm water off the streets and onto the beach by using heavy machinery to dig trenches on the beach below the elevation of the lowest outfall pipes and scuppers.  Id. 123:6-125:18, 139:2-18 (Walberg).  These trenches create ponds of water on the beach that remain until the water percolates through the sand to the water table.  At times, the trenches are extended to the ocean in order to move the water out more quickly.  Id. 126:7-21 (Walberg); Bartles Decl. ¶ 6.

### B. Development of the Project Design

The Project is the culmination of a project study process that included a September 1990 Reconnaissance Study, an August 1996 Feasibility Report, and the December 1996 Report of the Chief of Engineers.  Watson Decl. ¶ 3.  Congress authorized the Project in the Water Resources Development Act of 1996.  The Corps published a summary of the Project, including a discussion of alternative designs considered and financial considerations evaluated, which explained why the dune and berm design provides the greatest degree of protection to the communities of Absecon Island at the most reasonable cost.  Id. ¶ 4.

As currently designed, the dune in Margate will be +12.75 NAVD88 and the berm will be one hundred feet wide with an elevation of +7.25 NAVD88.  Id. ¶ 5.  Therefore, the beach will be about five feet lower in elevation than the top of the dune, and the area between the bulkhead and dune will be about seven feet lower in elevation than the top of the dune.  Id. ¶ 6.

The Project was originally designed in the mid-1990s.  In August 1996, a Feasibility Report was issued which reflected, among other things, various designs, cost-benefit calculations associated with these designs, and an Environmental Impact Statement ("EIS") about the Project.  PI Hrg. Tr. 173:22-180:20 (Watson).  The EIS was circulated for public comment and no comments were submitted about the potential impact of the Project's construction on the storm water drainage system in Margate.  Id. 217:19-218:12 (Watson).

### C. Concerns Raised by Margate

In September 2001, due to concerns about the potential effect of a dune and berm system on Margate's drainage system, Edward Walberg, Margate's municipal engineer, developed a proposal for the installation of a new drainage system for Margate.  The proposal was estimated to cost $5.5 million to construct.  Id. 109:11-110:10 (Walberg); Atlantic Ocean Beach Storm Sewer Estimate [Pls. Ex. 7].  Ultimately, however, Margate did not implement the proposed drainage system and continued

addressing storm water by digging trenches on the beach.  PI
Hrg. Tr. 110:11-113:13 (Walberg).

An Environmental Assessment ("EA") of the Project was
performed from 2011 through 2013 and was circulated for public
comment.  Id. 218:13-23 (Watson).  The primary focus of the EA
was on the use of a different borrow area as a source of sand
for the Project.  It also addressed considerations about beach
nourishment.  No comments were submitted about the potential
effects of the Project's construction on Margate's storm water
drainage system.  Record of Environmental Consideration
[Pls. Ex. 19]; PI Hrg. Tr. 218:24-219:1 (Watson).

The Project was partially constructed in the mid-2000s in
Atlantic City and Ventnor.  Watson Decl. ¶ 9.  In 2013, Congress
authorized appropriations for the remaining 3.2 miles of the
Project on Absecon Island after Hurricane Sandy.  Id. ¶ 10.  The
Project design issued around that time planned for the elevation
of the area between the bulkhead and the dune to be at the same
elevation as the berm, around +7.25 NAVD88.  PI Hrg. Tr. 242:11-
243:25 (Bartles).  In September 2013, Mr. Walberg sent a letter
to NJDEP expressing concerns about insufficient space between
the toe of the dune and the bulkhead.  Sept. 11, 2013 Walberg
Letter [Pls. Ex. 8]; PI Hrg. Tr. 135:10-136:24 (Walberg).

On February 4, 2014, the Corps issued the Hurricane Sandy
Limited Reevaluation Report (the "Reevaluation Report").

Reevaluation Report [Pls. Ex. 18]; PI Hrg. Tr. 198:2-8 (Watson). In the time period before and after the issuance of the Report, the Corps received a number of requests to modify the Project's design. The Corps worked to accommodate those requests, consistent with the storm-protection features of the Congressionally-approved Project design. Id. 219:2-220:3 (Watson). On April 11, 2014, Mr. Walberg expressed concerns to William Dixon at NJDEP that the proposed elevation of the sand between the bulkhead and the dune, +7.25 NAVD88, would be higher than and, therefore, block a majority of the scuppers and outfall pipes. Apr. 11, 2014 Walberg Letter [Pls. Ex. 10].

### D. The Corps' Response

In response to Mr. Walberg's concerns, around May 2014, the Corps began an investigation into the hydrology of Margate in order to assess the impact of the Project on Margate's storm water drainage (the "Hydrologic Investigation"). PI Hrg. Tr. 228:11-21 (Bartles). The Corps sought to ensure that it did not make a preexisting condition worse as a result of the construction. Id. 178:24-179:22 (Watson). Michael Bartles was the professional engineer primarily responsible for developing a model of Margate's hydrology. He worked with a team of staff who were familiar with both the Project and Margate's drainage issues. Id. 228:11-229:4 (Bartles).

Mr. Bartles began by assembling data collected about
Margate's hydrology, geography, and topography, including
information about Margate's groundwater, tides, and soil types,
into a geographic information system to create a model.
Mr. Bartles also visited Margate and inspected numerous street
ends, measured the scupper sizes, grades sizes, and the relative
heights of the scuppers and the bulkhead or street levels.  Id.
229:5-237:16 (Bartles).

The model was developed to reflect the physical dynamics of
water in Margate, so that the model could be used to evaluate
what will happen to storm water in Margate once the Project is
constructed.  Mr. Bartles calibrated the model with reference to
a storm that occurred from April 30, 2014 to May 1, 2014.  Id.
236:4-237:11, 238:24-240:18, 242:11-244:10 (Bartles).  He also
ran sensitivity analyses to test, among other things, the effect
of soil particle size on infiltration rates.  As a result of
these analyses, Mr. Bartles concluded that the change in soil
particle size did not materially affect the model's performance.
Id. 240:19-242:10 (Bartles).

After calibrating the model, Mr. Bartles inputted the
original Project design conditions with the dune in place and
the sand between the bulkhead and the toe of the dune at a
uniform elevation of +7.25 NAVD88.  He then ran the model
assuming that significant rainfall occurred.  The model

10

indicated that, under those conditions, Margate would have slightly worse issues with water ponding on the beach and in the streets than it did without the Project in place.  Id. 242:11-243:25 (Bartles); Margate City Hydrologic Investigation Report ("Hydrologic Investigation Report") at 21-25 [Pls. Ex. 5].

Next, Mr. Bartles investigated whether lowering the uniform height of the sand between the bulkhead and the toe of the dune from +7.25 NAVD88 to +4.5 NAVD88 would affect the performance of Margate's drainage system during substantial rainfall.  PI Hrg. Tr. 244:1-245:6 (Bartles); Hydrologic Investigation Report at 26-29.  At a uniform elevation of +4.5 NAVD88, the sand would be at a higher elevation in some places than it currently is, and lower in others.  PI Hrg. Tr. 245:7-16 (Bartles).  The sand would also be approximately two feet higher than the water table.  Id. 262:15-19 (Bartles).  Mr. Bartles ran the model with the Project conditions amended to include a uniform elevation of sand at +4.5 NAVD88 between the bulkhead and the toe of the dune.  This alleviated most issues that arose when the sand was at a uniform elevation of +7.25 NAVD88.  However, the model indicated that there was still a slight increase in ponding depth and duration at one location, Nassau Avenue, as compared to current conditions.  Id. 245:17-246:9 (Bartles); Hydrologic Investigation Report at 26-29.

Mr. Bartles then ran the model with the uniform elevation of +4.5 NAVD88 between the bulkhead and the toe of the dune and a proposed piping system. PI Hrg. Tr. 244:11-21 (Bartles). This resulted in better outcomes for ponded water on the streets, but increased ponded storm water retention times on the beach. Hydrologic Investigation Report at 32.

Finally, Mr. Bartles ran the model with the uniform sand elevation of +4.5 NAVD88 between the bulkhead and the toe of the dune and doubled the size of the scupper at Nassau Avenue. PI Hrg. Tr. 246:4-24 (Bartles). The model indicated that these proposed design changes would reduce storm water depths on many streets and decrease ponded storm water retention times on the beach as compared to existing conditions. Hydrologic Investigation Report at 35. Mr. Bartles testified that, while there will still be ponding on the beach, the Corps anticipates that the ponding will not be as severe as it presently is without the Project in place and will not last for as long as it currently does. PI Hrg. Tr. 248:2-14 (Bartles). As he explained, the uniform elevation of the area between the bulkhead and the toe of the dune is designed to allow storm water runoff to spread over a larger area of the beach, which increases the area through which the water can percolate through the sand. This, in turn, decreases the amount of time standing water is expected to be on the sand after a storm. Id. 265:22-

267:4 (Bartles).   The results of this investigation were documented in the Hydrologic Investigation Report, dated November 2014.

Accordingly, the Project design was amended to include the outcome suggested by the Hydrologic Investigation.   Under the current design, the sand between the bulkhead and the toe of the dune will be uniformly graded to +4.5 NAVD88 and the scupper at Nassau Avenue will be doubled in size.   Id. 246:25-247:13 (Bartles).   This uniform sand elevation of +4.5 NAVD88 is higher than the lowest elevations of sand that currently exist on Margate's beaches.   Id. 129:2-130:5, 141:9-19 (Walberg).

Mr. Bartles testified that, with the amended design, there should be no ponding on the beach in the area between the bulkhead and the toe of the dune other than after a storm.   He further testified that the ponding would occur for up to 24 to 36 hours after a major storm event, but that there should be no ponding during dry periods.   Id. 249:11-250:4, 262:10-23, 263:23-264:5 (Bartles).   Additionally, according to the Corps' analyses performed by Mr. Bartles, the Project should protect the bulkhead from the ocean during all but the most severe of storms, as a storm surge is not expected to overtop the dunes. Bartles Decl. ¶ 14.

### E. **The Corps' Solicitation of Bids and Award of Contract**

On September 18, 2014, Mr. Walberg sent another letter to NJDEP expressing his concerns about ponding and the street end scuppers.  PI Hrg. Tr. 117:5-22 (Walberg); Sept. 18, 2014 Walberg Letter [Pls. Ex. 11].  Days later, Mr. Dixon relayed these concerns to the Corps.  Sept. 24, 2014 Dixon Letter [Pls. Ex. 21].  On October 24, 2014, the Corps responded to Mr. Dixon, indicating that its modeling "shows that there is no increase in water surface over the existing conditions on any of the streets adjacent to the beach."  Oct. 24, 2014 Goldberg Letter [Pls. Ex. 22].

The Corps issued a bid solicitation for the Project on August 31, 2016.  The solicitation and amendments thereto were publicly available online.  Dixon Decl. ¶ 74.  The Corps opened bids for the Project on October 21, 2016, and it awarded the contract on November 23, 2016.  Watson Decl. ¶ 14.  The Corps expects that construction of the Project in Margate will begin in March or April 2017.  PI Hrg. Tr. 217:14-18 (Watson).  It is this construction that Plaintiffs seek to enjoin.

### F. **Testimony of Plaintiffs' Witnesses - Charles Dutill and Edward Walberg - in Opposition to the Project**

Plaintiffs contend that the Project will result in a public nuisance and irreparable harm.  They have presented the testimony of Charles Dutill, a professional engineer, to support

14

their position.  Mr. Dutill opined that the Project will result
in two to three feet of groundwater being exposed, which will,
in turn, create a 1.5-mile-long, 15 to 200-foot-wide, and
several foot-deep lagoon between the bulkhead and the toe of the
dune.  The size of the lagoon would vary depending on the tide
and weather conditions.  PI Hrg. Tr. 15:11-16:14 (Dutill).
Mr. Dutill's conclusions rest on the assumption that the Project
design involves digging away between two and three feet of sand
from the existing elevation of the beach.  Id. 24:1-23, 27:18-
24, 87:6-88:12 (Dutill).  Mr. Dutill testified that, because
groundwater in Margate presently rises above the beach's top
elevation at high tide, lowering that surface by 2.5 feet will
create at least a 2.5-foot-deep pond between the bulkheads and
dunes.  Id. 24:6-23 (Dutill).  In Mr. Dutill's view, the soil
excavation required as part of the Project "simply intersects a
sub-surface, never-ending lake."  Pls. Proposed Findings of Fact
("PFOF") ¶ 72 [Docket No. 37] (citing PI Hrg. Tr. 28:10-30:15,
93:2-94:14 (Dutill)).

    Mr. Dutill further testified that, if the Project is built,
there will be an enormous moat parallel to the bulkhead that
will impede public access to the beach, twice a day, every day
during high tides when exposed groundwater is at least 2.5 feet
deep and on average 100 feet wide.  PI Hrg. Tr. 24:1-13, 31:6-
33:6, 36:5-15 (Dutill).  In Mr. Dutill's opinion, the lagoon

could reach the top of the bulkhead at times.  Id. 59:4-22
(Dutill).  According to Mr. Dutill, this large lagoon would
cause significant public safety and health problems due to
contaminants in the water, such as pesticides, oil, garbage, and
animal feces.  It would also pose a danger to individuals who
attempt to wade across the lagoon to access the beach.  Id.
46:1-25 (Dutill).  Mr. Dutill testified that the large lagoon
would remain for over 36 hours after a storm.  Id. 16:11-14
(Dutill).

Mr. Dutill further opined that the Project would increase
flooding on beachfront properties on the streets of Margate.
Id. 39:17-40:20 (Dutill).  Specifically, he predicted that, if
the Project were built, it would be significantly more likely
that water would reach the garage of 114 S. Barclay Avenue, the
residence of one of the Plaintiffs.  Dutill Decl. ¶¶ 91-94.

As the testimony of Mr. Walberg revealed, in August 2016,
he drafted a second proposal for a storm water drainage system
in Margate.  This proposal was estimated to cost around
$9.6 million, an increase of roughly $4.1 million from the 2001
estimate.  PI Hrg. Tr. 119:16-120:7 (Walberg); Beach Storm Sewer
Outfall Modification [Pls. Ex. 12].  Mr. Walberg testified that
it would take between two to three months to prepare design
plans, some uncertain amount of time to obtain permits, and
between nine and twelve months to construct the proposed

16

drainage system.  PI Hrg. Tr. 148:11-150:25 (Walberg).  He also testified that the system could be constructed after the Project was built, but that the cost might increase between ten and twenty percent.  Id. 152:11-153:7 (Walberg).  Mr. Walberg further testified that his proposed storm water system would alleviate Mr. Dutill's concerns if constructed.  Id. 113:14-114:4, 120:14-121:7, 148:2-7 (Walberg).

As a general rejoinder to Plaintiffs' concerns, the Corps and NJDEP have made repeated assurances that they will assist Margate in alleviating any drainage issues that might develop as a result of the construction of the Project.  Id. 142:5-19 (Walberg); 212:20-213:15 (Watson).

## II.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" that should be granted only "upon a clear showing that the plaintiff is entitled to such relief." Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 197 (3d Cir. 2014) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008)).  A plaintiff seeking a preliminary injunction must demonstrate: "(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors

such relief." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).

Moreover, the party seeking an injunction must meet all four preliminary injunction factors and "failure to establish any element in [plaintiff's] favor renders a preliminary injunction inappropriate." NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999); accord Lanin v. Borough of Tenafly, 515 F. App'x 114, 117 (3d Cir. 2013) ("All four factors must favor preliminary relief."); Maximum Quality Foods, Inc. v. DiMaria, 2014 WL 6991967, at *2 (D.N.J. Dec. 10, 2014) ("A party must produce sufficient evidence of all four factors-- and a district court should weigh all four--prior to granting injunctive relief.") (internal citation omitted).  Accordingly, the Court addresses each factor below.

III.  **ANALYSIS**

> A. <u>**Likelihood of Success on the Merits**</u>

Plaintiffs rely upon two counts of the Third Amended Complaint in their application for a preliminary injunction: public nuisance under state law against the State Defendants and public nuisance under federal common law against the Federal Defendants (Count I) and violation of the Administrative Procedure Act ("APA") against the Federal Defendants (Count VI).

### i. Public Nuisance (Count I)

Plaintiffs assert a New Jersey state law claim for public nuisance against the State Defendants and a federal common law public nuisance claim against the Federal Defendants.  The State and Federal Defendants argue that the Plaintiffs have not established a likelihood of success on the merits of the public nuisance claim for several reasons.  The Court agrees.

### 1. Eleventh Amendment Immunity

The State Defendants contend that Plaintiffs' state law public nuisance claim must be dismissed as a result of the Eleventh Amendment's sovereign immunity protection.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  U.S. Const. amend. XI.  As the United States Supreme Court has explained, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . ."  Alden v. Maine, 527 U.S. 706, 713 (1999).  "The preeminent purpose of [sovereign immunity] is to accord States the dignity that is consistent with their status as sovereign entities."  Fed. Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S. 743, 760 (2002).  As such, the

Eleventh Amendment is ordinarily a bar to suits against unconsenting states by citizens, along with suits against state officers sued in their official capacity.  Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

Nonetheless, "a State's sovereign immunity is a personal privilege which it may waive at pleasure" and "is altogether voluntary on the part of the sovereignty."  Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) (internal citations and quotations omitted).  The "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."  Id. (quoting Atascadero State Hospital v. Scanlon, 473 U.S. 234, 241 (1985)).  Accordingly, federal courts will generally find a waiver "either if the State voluntarily invokes our jurisdiction" or "if the State makes a 'clear declaration' that it intends to submit itself to our jurisdiction."  Id. 675-76 (internal citations omitted).

In this vein, when a state voluntarily agrees to remove a case to federal court, it waives its immunity under the Eleventh Amendment as it has "voluntarily invoked the federal court's jurisdiction."  Lapides v. Bd. of Regents of Univ. Sys. of Georgia, 535 U.S. 613, 620 (2002).  The Third Circuit reiterated this holding in Lombardo v. Pennsylvania, Dep't of Pub. Welfare, 540 F.3d 190, 198 (3d Cir. 2008).  In Lombardo, the Third

Circuit held "that the Commonwealth's removal of federal-law
claims to federal court effected a waiver of immunity from suit
in federal court."  Id.  The Lombardo court, however, explicitly
stated that its "holding today does not affect a State's ability
to raise sovereign immunity when it is involuntarily brought
into federal court."  Id. (emphasis added).

Here, the Corps removed this action from state court as a
matter of right as a federal agency, pursuant to 28 U.S.C.
§ 1442(a).  Notice of Removal ¶ 6 [Docket No. 1].  NJDEP
consented to the removal to federal court.  Id. ¶ 5.  However,
the Corps' right to remove this matter to federal court pursuant
to 28 U.S.C. § 1442(a)(1) is "absolute."  Melo v. Hafer, 912
F.2d 628, 641 (3d Cir. 1990) (quoting Willingham v. Morgan, 395
U.S. 402, 406 (1969)), aff'd, 502 U.S. 21 (1991).  As such, the
consent of all defendants is not required to remove an action
under Section 1442(a)(1).  See id.; Hammell v. Air & Liquid Sys.
Corp., 2016 WL 6275383, at *1 n. 3 (D.N.J. Oct. 26, 2016).

Accordingly, NJDEP argues, "although the State consented to
the Army Corps' removal [pursuant to 28 U.S.C. § 1442(a)(1)],
that does not constitute a waiver because the State could not
possibly have prevented the removal and because the State itself
did not instigate the removal."  NJDEP Proposed Conclusions of
Law ("PCOL") p. 24 [Docket No. 38].  The Court reiterates that
the "test for determining whether a State has waived its

immunity from federal-court jurisdiction is a stringent one."
<u>Coll. Sav. Bank</u>, 527 U.S. at 675.   The State Defendants have
consistently asserted their Eleventh Amendment immunity in every
submission to this Court.   The Court finds that the State
Defendants have not voluntarily invoked this Court's
jurisdiction or made a "clear declaration" of their intention to
submit themselves to this Court's jurisdiction, as required to
find a waiver of the Eleventh Amendment sovereign immunity.
<u>See</u> <u>id.</u> at 675-76.[3]   Therefore, at this juncture, Plaintiffs have
not met their burden of establishing that the State Defendants
have waived their Eleventh Amendment immunity as to the state
law public nuisance claim.   For this reason, the Court finds
that Plaintiffs have not established a likelihood of success on
the merits of their state law public nuisance claim against the
State Defendants.

### 2. Standing

Alternatively, both the State and Federal Defendants argue
that Plaintiffs cannot succeed on the merits of their public
nuisance claim because Plaintiffs, as private citizens, do not

---

[3] The Court notes that the Defendants intend to file formal
motions to dismiss which address, among other issues, Eleventh
Amendment immunity.   The parties have agreed to postpone this
motion practice until after the disposition of the Plaintiffs'
application for a preliminary injunction.   <u>See</u> December 23, 2016
Letter [Docket No. 33].   The Court may revisit its findings
regarding Eleventh Amendment immunity at such later stage, as
appropriate.

have standing to pursue a claim for public nuisance under state or federal common law.

Under New Jersey state law, a private party can only pursue a public nuisance claim "if the private plaintiff 'has suffered harm of a kind different from that suffered by other members of the public.'" In re Lead Paint Litig., 191 N.J. 405, 427 (2007) (quoting Restatement (Second) of Torts § 821C(1)); accord Corradetti v. Sanitary Landfill, Inc., 912 F. Supp. 2d 156, 163 (D.N.J. 2012) ("It is certainly true that a plaintiff who lacks the right to damages [for public nuisance] cannot seek an injunction, but if a private plaintiff has a right to sue for damages because of a harm different in kind, then that party may also pursue an action to abate the nuisance as it affects all members of the public.") (internal citations and quotations omitted); Seven Plus One, LLC v. Sellers, 2016 WL 6994346, at *3 (N.J. Super. Ct. App. Div. Nov. 29, 2016) ("In order to maintain a proceeding to enjoin [or] abate a public nuisance, a private individual must have suffered a harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of the interference.") (internal citations and quotations omitted).

It is undisputed that Plaintiffs have not yet suffered any damages or harm. Plaintiffs, however, contend that "as beach front property owners, they will be uniquely damaged by the

Project's drainage ramifications."  Pls. PCOL ¶ 55 [Docket
No. 37].  The only evidence before this Court to support this
position is Mr. Dutill's testimony that, after severe storms,
ponded water will be more likely to back up through the scuppers
onto Plaintiffs' properties.  PI Hrg. Tr. 39:17-40:20 (Dutill);
Dutill Decl. ¶¶ 91-94.  However, this is directly contradicted
by the Hydrologic Investigation Report and the testimony of
Mr. Bartles, which indicates that the current Project design
would <u>not</u> result in any increased flooding upland of the
bulkhead, i.e. on the streets of Margate.  <u>See, e.g.</u>, Hydrologic
Investigation Report at 35; PI Hrg. Tr. 248:2-23, 265:22-266:3
(Bartles).  Indeed, even Mr. Dutill agreed that the Project will
not "increase storm water runoff from Atlantic Avenue down onto
the beach."  PI Hrg. Tr. 85:23-25 (Dutill).

     For the reasons set forth in detail below, the Court does
not find Mr. Dutill's conclusions persuasive, especially in
contrast with Mr. Bartles' opinions.  Mr. Bartles testified that
the results of the Corps' thorough Hydrologic Investigation
demonstrate that the construction of the Project will not worsen
flooding or ponding upland of the bulkhead on the streets of
Margate.  The Court finds that, on the record before it,
Plaintiffs have not established that they will suffer any harm
of a kind different from that suffered by other members of the
public if the Project is constructed.  Accordingly, even

                                24

assuming that the State Defendants have waived their Eleventh
Amendment immunity, Plaintiffs have not established a likelihood
of success on the merits of their state law public nuisance as
they appear to lack standing to pursue such a claim.

Whether Plaintiffs, as private citizens, have standing to
assert public nuisance claims under federal common law remains
an open question.  See, e.g., Am. Elec. Power Co. v.
Connecticut, 564 U.S. 410, 422 (2011) ("We have not yet decided
whether private citizens (here, the land trusts) or political
subdivisions (New York City) of a State may invoke the federal
common law of nuisance to abate out-of-state pollution.");
Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,
453 U.S. 1, 21 (1981) (finding that "federal common law of
nuisance in the area of water pollution is entirely pre-empted
by" federal statutes, such that "[i]n these cases, we need not
decide whether a cause of action may be brought under federal
common law by a private plaintiff"), vacating Nat'l Sea Clammers
Ass'n v. City of N.Y., 616 F.2d 1222 (3d Cir. 1980); Michigan v.
U.S. Army Corps of Engineers, 667 F.3d 765, 772 (7th Cir. 2011)
(noting that the Supreme Court's "statement [in American
Electric] cautions us to tread carefully whenever we consider
how far to push a theory of federal common law."); see also
Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 866
(9th Cir. 2012) (Pro, J., concurring) ("Because Kivalina's

federal common law nuisance damages claim is displaced, the Court need not address the open question of whether Kivalina is the type of party that can bring a federal common law nuisance claim."). However, it appears that Plaintiffs do not have standing to pursue their public nuisance claim under federal common law as they have not demonstrated that they will suffer an injury in fact, for the reasons set forth below, as required to establish standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

For these reasons, as Plaintiffs have not established that they have standing to pursue their public nuisance claim under state or federal common law, the Court finds that Plaintiffs are not likely to succeed on the merits of such claim.[4]

### 3. Substantive Merits of Public Nuisance Claim

In addition to the foregoing arguments, the Defendants also contend that Plaintiffs cannot establish a likelihood of success on the merits of their public nuisance claim because the evidence indicates that no public nuisance will transpire if the Project is constructed. The Court concurs. For the following reasons, even assuming that Plaintiffs have standing to assert

---

[4] The Court notes once again that Defendants intend to file formal motions to dismiss after the disposition of Plaintiffs' application for a preliminary injunction. Once it has had the benefit of more complete briefing on the issue of standing, the Court may revisit its findings, as appropriate.

these claims, which it appears they do not, the Court finds that Plaintiffs have not established a likelihood of success on the merits of their public nuisance claim.

Under federal common law, a plaintiff seeking to enjoin a public nuisance must demonstrate an unreasonable interference with a right common to the general public and that the conduct at issue "interferes significantly with the public health, safety, peace, comfort, or convenience." Michigan v. U.S. Army Corps of Engineers, 667 F.3d 765, 781 (7th Cir. 2011) (citing Restatement (Second) of Torts § 821B). Additionally, "[a] court may grant equitable relief to abate a public nuisance that is occurring or to stop a threatened nuisance from arising." Id.

Similarly, to succeed on the merits of a public nuisance claim under New Jersey state law, a plaintiff must establish: "(1) an unreasonable interference and (2) a right common to the general public." Rowe v. E.I. Dupont De Nemours & Co., 262 F.R.D. 451, 462 (D.N.J. 2009). New Jersey has adopted the Restatement (Second) of Torts for its "concepts of public nuisance." Lead Paint, 191 N.J. at 424. The Restatement defines a public nuisance as an "unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). "Circumstances that may sustain a holding that an interference with a public right is unreasonable include . . . [w]hether the conduct involves a significant interference

with the public health, the public safety, the public peace, the public comfort or the public convenience[.]" Id. § 821B(2).

Section 821C of the Restatement (Second) of Torts defines who can recover for public nuisance and, most importantly, who can "maintain a proceeding to enjoin to abate a public nuisance." Section 821C(1) states that, "[i]n order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public . . . ." (emphasis added). Section 821C(2), in turn, limits those who can sue to enjoin a public nuisance to those who "have the right to recover damages, as indicated in Subsection (1)."

The Court agrees with the Defendants that these provisions "require an existing interference with a right common to the public in order to seek recovery – in damages or in equity – for that harm." Corps Opp. Br. at 17 [Docket No. 17] (emphasis added). The plain language of the Restatement and the case law indicates that, unlike federal law, injunctions are not generally issued under New Jersey's tort law for a public nuisance unless a harm has actually occurred. See, e.g., Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315-16 (3d Cir. 1985) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public

28

. . . .  The same requirements apply to individual plaintiffs seeking injunctive relief."); Corradetti, 912 F. Supp. 2d at 163 (noting that under New Jersey law "[i]t is certainly true that a plaintiff who lacks the right to damages [for public nuisance] cannot seek an injunction" to abate a public nuisance"); James v. Arms Tech., Inc., 359 N.J. Super. 291, 329-331 (App. Div. 2003) (gun manufacturers liable for public nuisance due to the manufacture and sale of guns that enter the illegal market); Priory v. Borough of Manasquan, 39 N.J. Super. 147, 157-58 (App. Div. 1956) (overturning injunction and noting that "[a]n injunction should not issue on the basis of mere apprehension" and that plaintiffs lacked "standing in this court until" the conduct occurred "and proved to be a nuisance."); Southampton Twp. v. Scott, 91 N.J. Eq. 443, 445-47 (Ch. 1920) (public nuisance declared after property owner filled in municipal drainage ditches).

Here, as it is undisputed that no part of the Project has yet been built in Margate and that no harm has yet come to the Plaintiffs as a result of any Project construction, Plaintiffs have not suffered any damages and cannot maintain this action under state law.  For this reason, Plaintiffs have not established a likelihood of success on the merits of their state law public nuisance claim.

The Court finds, however, that, even if an injunction to
prospectively abate a public nuisance could issue under
New Jersey state law, Plaintiffs have failed to establish the
likelihood of an unreasonable interference with a right common
to the general public, as required to establish a public
nuisance under both state and federal common law.  The evidence
presented to the Court establishes that it is unlikely that any
such public nuisance will develop as a result of the Project's
construction.

Plaintiffs' alleged public nuisance claim rests entirely
upon the submission of their expert, Charles Dutill.  Mr. Dutill
is a professional engineer who was admitted as an expert in the
fields of civil engineering, storm water management, and
hydrology.  As described above, Mr. Dutill testified that, in
his opinion, the Project will result in two to three feet of
groundwater being exposed, which will create a 1.5-mile-long,
15 to 200-foot-wide, and several foot-deep lagoon on Margate
beach between the bulkhead and the toe of the dune that is full
of contaminants, garbage, and animal feces.  PI Hrg. Tr. 15:11-
16:14, 46:1-18 (Dutill).  In Mr. Dutill's view, the Project
would essentially transform Margate's beach into a "junkyard."
Id. 47:7-16 (Dutill).

Mr. Dutill's conclusions about the extent and volume of
water that will exist between the toe of the dune and the

30

bulkhead in the event the Project is constructed are premised, however, upon the faulty and unfounded assumption that the Project requires the Corps to dig between two to three feet into the existing water table in Margate. Id. 24:1-13, 27:18-24; 87:6-88:12 (Dutill). Moreover, Mr. Dutill did not perform or rely upon any computer modeling of Margate's hydrology or conduct his own analyses to arrive at his conclusions. Id. 65:13-22, 69:19-70:20, 72:2-19 (Dutill). Rather, his opinion is based upon a single site visit to a two-block area in Margate on one day, as well as his interpretation of the Corps' analyses. Id. 53:24-54:2 (Dutill). Finally, Mr. Dutill did not clearly state what units of measurement he utilized in arriving at his conclusions, alluding only once to MLLW. Dutill Decl. ¶ 34.

Mr. Dutill's opinions stand in stark contrast with the sound opinions of Mr. Bartles, who consistently and clearly used the geodetic datum NAVD88. It appears that Mr. Bartles and Mr. Dutill utilized different units of measurements, which may account for the discrepancy in their opinions and why the Corps would grade the area between the dune and the bulkhead to +4.5 NAVD88, as that remains well above the tidally-influenced groundwater level. Id. 261:22-262:23 (Bartles).

Moreover, the testimony demonstrates that the proposed elevation of the sand between the toe of the dune and the bulkhead is slightly higher than the lowest elevations of the

31

beach as it currently stands.  Additionally, the current water
table elevation in Margate is lower than the lowest elevations
of the beach.  Id. 129:2-130:5, 141:9-19 (Walberg); 262:10-19
(Bartles).  Accordingly, as Mr. Bartles credibly explained, the
sand would be approximately two feet higher than the water table
at a uniform elevation of +4.5 NAVD88, as contemplated by the
final Project design.  Id. 262:10-19 (Bartles).  Mr. Bartles
also persuasively testified that the Hydrologic Investigation
revealed that the Project will likely not, at the very least,
exacerbate or worsen any drainage issues in Margate.  Id.
246:4-24, 248:2-14, 265:22-267:4 (Bartles); Hydrologic
Investigation Report at 35.

    Mr. Bartles' testimony was quite persuasive.  He is a
licensed professional engineer who has been employed as a
hydraulic engineer for the Corps since July 2009.  Bartles Decl.
¶ 1; PI Hrg. Tr. 227:22-228:11-16 (Bartles).  He credibly and
objectively testified about the Corps' comprehensive and data-
driven modeling and investigation into the hydrologic effects of
the Project on Margate.  Mr. Bartles and his team of experienced
engineers performed a six-month investigation of the impact of
the Project on Margate's hydrology, which involved inspecting
Margate's streets and measuring scupper and grade sizes, as well
as the relative heights of scuppers and the bulkheads and street
levels.  The team worked diligently to collect data, perform

sensitivity analyses, and model different conditions in an effort to address concerns about Margate's drainage.  PI Hrg. Tr. 229:5-246:24 (Bartles).  According to the results of the Hydrologic Investigation, as well as Mr. Bartles' testimony, the Project, as currently designed, should not result in ponding on the beach in the area between the bulkhead and the toe of the dune other than after a storm and, in any case, it will not worsen the already existing ponding and drainage issues that Margate faces.  Id. 262:10-23 (Bartles).

Moreover, even if Mr. Dutill's concerns about a giant lagoon filled with contaminants were to materialize, which Mr. Bartles credibly dispelled, Margate's own municipal engineer, Mr. Walberg, testified that his proposed drainage system, discussed in detail above, would resolve the problems and that the system could be installed after the dunes are in place.  Id. 113:14-114:4, 120:14-121:7, 148:2-7 (Walberg). Additionally, as noted earlier, the Corps and NJDEP have repeatedly indicated that they will work with Margate to alleviate any exacerbated drainage, flooding, or ponding issues, if they occur.  Id. 142:5-19 (Walberg); 168:15-170:4 (Dixon); 212:20-213:15 (Watson).

To echo a familiar refrain, the parties have presented the Court with a battle of the experts.  In resolving that battle, the Court looks to the record and finds not only that

33

Mr. Dutill's opinions are flawed, but that the Corps thoroughly investigated the Project's impact on Margate and specifically amended the Project design to avoid exacerbating drainage and ponding issues in Margate.  To the extent that some ponding will occur after major storm events, the Court notes that this already occurs in Margate.  In any case, a brief period of impeded beach access after a severe storm cannot be considered such a significant interference with a public right that it constitutes a public nuisance.

In short, the Plaintiffs have not established that the Project, if constructed as currently designed, would result in an increase in drainage issues and ponding such that a public nuisance would occur.  Accordingly, for all of the foregoing reasons, the Court finds that Plaintiffs have failed to establish a likelihood of success on the merits of their public nuisance claim under state or federal common law.

### ii. APA Claim (Count VI)

Plaintiffs claim that the Federal Defendants have violated the APA in three manners.  First, Plaintiffs contend that the Corps' decision to issue the Reevaluation Report and approve the Project on February 4, 2014 without considering Margate's drainage issues was an arbitrary and capricious final agency action.  Second, according to Plaintiffs, the Corps' decision to open bids on the Project on October 21, 2016 without considering

34

Margate's drainage issues is also an arbitrary and capricious final agency decision.  Finally, Plaintiffs argue that the Corps failed to comply with the procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., in designing and executing the Project.

### 1. Decision to Approve Project and Open Bids

While the APA does not itself confer jurisdiction, a court may have jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA.  See Califano v. Sanders, 430 U.S. 99, 107 (1977) ("the APA does not afford an implied grant of subject-matter jurisdiction.").  "Under the APA, any 'person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review.'"  Smriko v. Ashcroft, 387 F.3d 279, 290 (3d Cir. 2004) (quoting 5 U.S.C. § 702).  Section 704 of the APA provides that a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.

Plaintiffs argue that the Corps' February 4, 2014 decision to approve the Project and the Corps' October 21, 2016 decision to open bids for construction were arbitrary and capricious final agency decisions because the Corps failed to consider the drainage impacts on Margate.  The Corps responds that Plaintiffs have not identified how either of these actions caused

35

Plaintiffs "legal wrong," as defined by Section 702 of the APA, or caused Plaintiffs to be "aggrieved" within the meaning of a relevant statute.  Corps PCOL ¶¶ 21-22 [Docket No. 39].  The Court agrees.  Plaintiffs have not adequately pled or established that they have been aggrieved or suffered any legal wrong as a result of the Corps' decision to issue the Reevaluation Report and approve the Project on February 4, 2014 or the Corps' decision to open construction bids for the Project on October 21, 2016.

In any case, any APA claim based upon the Corps' February 4, 2014 decision to approve the Project and issue the Reevaluation Report, allegedly without considering the effect of the Project on Margate's drainage issues, is now moot in light of the Hydrologic Investigation.  As described above, from May through November 2014, the Corps performed a rigorous analysis of Margate's hydrology, involving complex computer modeling, sensitivity analyses, and multiple scenarios, and subsequently modified the Project design to reflect the investigation's conclusions.  The modifications made to the Project design as a result of the Hydrologic Investigation address and resolve the drainage concerns raised by the Plaintiffs.  As the Corps has already done what Plaintiffs now demand, namely considered the effects of the Project on Margate's drainage issues, the APA claim based upon the February 4, 2014 decision to approve the

Project is moot.  See, e.g., Chang v. Holder, 2010 U.S. Dist.
LEXIS 824, *3 (D.N.J. Jan. 6, 2010) ("Where the plaintiff seeks
only an order that the government take a specific action and the
government takes that action, the suit is moot."); Alamgir v.
Napolitano, 2010 WL 2723209, at *6-7 (W.D. Pa. July 8, 2010)
(granting motion to dismiss APA claims where government agency
"did exactly what Plaintiff requested"); Palamarachouk v.
Chertoff, 568 F. Supp. 2d 460, 466 (D. Del. 2008).

Additionally, to the extent that the Corps' decision to
open Project bids on October 21, 2016 can be considered a
reviewable final agency decision, Plaintiffs have not
established that it was arbitrary and capricious.[5]  The
Hydrologic Investigation completed in November 2014 establishes
that the Corps did not open bids on October 21, 2016 without
first considering the impact of the Project on Margate's
drainage system.  Plaintiffs claim--without evidence--that the
Hydrologic Investigation Report is "inherently untrustworthy"
and "inherently suspect."  Pls. PCOL ¶¶ 114, 125, 136, 142, 175.

_____

[5] It appears that the October 21, 2016 decision to open
Project bids is not a final agency action subject to review
under the APA as it does not "mark the consummation of the
agency's decisionmaking process" and it is not an action "by
which rights or obligations have been determined, or from which
legal consequences will flow."  Bennett v. Spear, 520 U.S. 154,
177-78 (1997) (internal citations and quotations omitted);
see also FTC v. Standard Oil Co., 449 U.S. 232, 240-42 (1980)
(noting that final agency actions have "the status of law" and
"immediate compliance with their terms was expected").

The Court disagrees.  The Hydrologic Investigation Report documents the Corps' comprehensive investigation into the potential consequences of the Project on Margate's drainage system.  Moreover, Mr. Bartles convincingly testified as to the investigation and its findings, which demonstrate not only that the Corps evaluated the Project's impact on Margate's drainage system but also that the Project was modified as a result so that it did not exacerbate any existing drainage problems or create any new issues in Margate.

### 2. Compliance with NEPA

Plaintiffs contend that "[t]he Corps violated [NEPA] by failing entirely to consider the Project's environmental consequences in Margate in light of its unique storm water management plan prior to approving the Project."  Pls. PCOL ¶ 128.  Plaintiffs also argue that the Corps' decision to "hid[e] the Hydrologic Investigation from Margate and its citizens from November 2014 until August 2016" violated NEPA.  Pls. Reply Br. at 13-14 [Docket No. 19].  Finally, according to Plaintiffs, the Corps' decision not to issue a supplemental EIS to address Margate's drainage issues also violated NEPA.  Id. at 15-17.  The Federal Defendants counter that "Plaintiffs have no likelihood of success on the merits of this claim because they did not participate in the public review and comment

process, and thus waived any objection on this basis to the
Corps' compliance with NEPA."  Corps PCOL ¶ 36.

   "NEPA is a procedural statute that does not mandate
particular substantive results."  Tinicum Twp., Pa. v. U.S.
Dep't of Transp., 685 F.3d 288, 294 (3d Cir. 2012) (quoting New
Jersey Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n,
561 F.3d 132, 133 (3d Cir. 2009)).  Accordingly, "NEPA does not
'mandate the particular decisions an agency must reach'; rather,
it sets forth the 'necessary process the agency must follow
while reaching its decisions.'"  Maiden Creek Assocs., L.P. v.
U.S. Dep't of Transp., 823 F.3d 184, 190 (3d Cir. 2016) (quoting
Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th
Cir. 1996)).

   The role of judicial review is merely to determine "whether
the agency took a 'hard look' at the potential environmental
impacts of its action.  '[Courts] do not, however, substitute
[their] judgment for that of the agency.'"  Tinicum, 685 F.3d at
294 (quoting Prometheus Radio Project v. FCC, 373 F.3d 372, 389
(3d Cir. 2004) (quoting Motor Vehicle Mfrs. Assoc. v. State Farm
Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))).

   "Persons challenging an agency's compliance with NEPA must
'structure their participation so that it . . . alerts the
agency to the [parties'] position and contentions,' in order to
allow the agency to give the issue meaningful consideration."

Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004)
(quoting Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def.
Council, Inc., 435 U.S. 519, 553 (1978)).  Accordingly,
"[p]arties challenging an agency's compliance with NEPA must
ordinarily raise relevant objections during the public comment
period." Sierra Club, Inc. v. Bostick, 787 F.3d 1043, 1048
(10th Cir. 2015) (citing Dep't of Transp., 541 U.S. 764-65).
Failure to do so results in a waiver of the challenge in
subsequent litigation.  See, e.g., id. at 1051 ("parties
challenging an agency's compliance with NEPA must raise relevant
objections during the comment period.  These objections must
specifically raise the issue presented on appeal; if the
objections do not raise the issue, it is waived."); E. Queens
All., Inc. v. F.A.A., 589 F. App'x 19, 20 (2d Cir. 2014)
(affirming denial of review of environmental assessment, in
part, because each of the objections raised was "forfeited
because it was not brought to the agency's attention during the
public comment period"); Friends of the Norbeck v. U.S. Forest
Serv., 661 F.3d 969, 974 (8th Cir. 2011) ("Failure to raise an
objection before the agency results in its waiver."); Idaho
Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir.
2002); Grand Canyon Trust v. U.S. Bureau of Reclamation,
623 F. Supp. 2d 1015, 1030 (D. Ariz. 2009) ("Failure to raise an

objection in response to a draft NEPA document forfeits that objection for purposes of later litigation.").

The record before the Court establishes that the Plaintiffs did not participate in the public review and comment process. Additionally, both the EIS and EA associated with the Project were circulated for public comment and no comments were submitted about Margate's drainage system.  See, e.g., PI Hrg. Tr. 217:19-219:1 (Watson); Record of Environmental Consideration.  By failing to submit their concerns about the Project's impact on drainage in Margate during the public review and comment process, Plaintiffs have not met their burden of proof that they did not waive their objections to the Corps' compliance with NEPA and, therefore, cannot seek judicial review on this basis.  Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on the merits of their APA claim based upon alleged non-compliance with NEPA.

### B. Irreparable Harm

To establish irreparable harm, a plaintiff must allege an injury that is "actual and imminent, not merely speculative." Macchione v. Coordinator Adm'r in Washington, D.C., 591 F. App'x 48, 49 (3d Cir. 2014).  "[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of immediate irreparable harm."  Id. at 49-50 (quoting Campbell

41

Soup Co. v. ConAgra, Inc., 977 F.2d 96, 91 (3d Cir. 1992))
(emphasis in original).  "The possibility that adequate
compensatory or other corrective relief will be available at a
later date, in the ordinary course of litigation, weighs heavily
against a claim of irreparable harm."  In re Revel AC, Inc.,
802 F.3d 558, 571 (3d Cir. 2015) (quoting Sampson v. Murray,
415 U.S. 61, 90 (1974)).

     Plaintiffs passionately argue that "[l]osing beach access
for days at a time, or for hours every day, is irreparable harm
[that] cannot be undone, [or] compensated with money."  Pls.
PFOF p. 2.  "They are fighting for the beach" and claim that the
"harm that will flow [from] this Court's failure to protect it,
will be, in the truest sense, irreparable."  Id.  Certainly, the
beach is an invaluable resource that must be protected.  The
Defendants agree and respond that the entire purpose of the
Project is precisely to protect the beaches of Absecon Island
against erosion, flooding, and the other devastating effects of
storm events for the benefit of generations to come.

     As the Court has already explained, the Court does not find
Mr. Dutill's opinions compelling.  Mr. Dutill's conclusion that
the Project would result in Margate's beach turning into a
"junkyard," complete with a lagoon full of garbage and feces
over which residents would have to wade, is directly
contradicted by the comprehensive Hydrologic Investigation and

the reliable testimony of Mr. Bartles.  While the Court understands Plaintiffs' fears in light of the dismal picture painted by Mr. Dutill, the record simply does not support Mr. Dutill's opinions.  His testimony is insufficient to carry Plaintiffs' burden of establishing actual and imminent irreparable harm.

To the extent that any ponding persists after the Project is constructed, the record demonstrates it will not be worse than the significant ponding that currently occurs in Margate after storms, without the Project.  Plaintiffs lose beach access at times even under existing conditions due to ponding and the presence of heavy machinery digging trenches on the beach.  Yet, Plaintiffs cannot credibly argue that they presently suffer irreparable harm each time a storm, rain, ponding, or bulldozers interfere with their ability to access and enjoy the beach. Moreover, as Mr. Walberg testified, Margate could implement a storm water drainage system (now at a proposed cost of around $9.6 million or after the Project is built for ten to twenty percent more), which would alleviate the parade of horribles Mr. Dutill describes.  Here, expensive harm and irreparable harm do not equate.

Furthermore, while any interference with Plaintiffs' ability to access and enjoy the beach for hours or days at a time is unfortunate, it does not constitute irreparable harm

43

under the law.  Plaintiffs rely upon two district court
decisions for their position that the loss of the ability to use
and enjoy the beach, even temporarily, is irreparable injury:
Rivera v. United States, 910 F. Supp. 239 (D.V.I. 1996) and
Atlanta School of Kayaking, Inc. v. Douglasville-Douglas County
Water & Sewer Authority, 981 F. Supp. 1469 (N.D. Ga. 1997).  The
Court first notes that neither decision is binding upon it.  In
any event, the cases are readily distinguishable.  For example,
in Rivera, the parties stipulated that the defendant's conduct
interfered with plaintiffs' use of the beach.  Rivera, 910
F. Supp. at 240 n. 4.  That is not the case here.  Indeed, the
Court has found that Plaintiffs have not established that the
construction of the Project would unreasonably interfere with
their use of Margate beach.

     Additionally, both cases involve total restrictions of
access to natural resources.  The plaintiffs in Rivera, for
instance, were not permitted to access the beaches on the
entirety of Buck Island at any time during a partial government
shutdown in violation of a U.S. Virgin Islands statute intended
to protect the public's right to use and enjoy the islands'
beaches and shorelines.  Id.  Likewise, the plaintiffs in
Atlanta School of Kayaking were "effectively [] banned from
canoeing or kayaking on the Dog River" altogether.  981 F. Supp.
at 1471.  Even if the Court were to credit all of Mr. Dutill's

44

opinions, Plaintiffs would not be forced to endure a blanket ban on their use of the beach.  At worst, the Project may cause a partial disruption of Plaintiffs' access to the beach.  This does not constitute irreparable harm.  See Am. Whitewater v. Tidwell, 2010 WL 5019879, at *11-12 (D.S.C. Dec. 2, 2010).[6]

In any event, the Defendants have repeatedly and consistently pledged that they will assist Margate in alleviating any increase in drainage problems, ponding, or flooding that occur as a result of the Project's construction. Mr. Watson even testified that the Corps would be willing to put in place temporary solutions to resolve drainage issues, if

_____

[6] In American Whitewater, the court considered a motion for a preliminary injunction by plaintiffs seeking to enjoin defendants from prohibiting floating on a certain portion of the Chattooga River.  2010 WL 5019879, at *1-3.  The court denied the motion for a preliminary injunction, finding that plaintiffs had failed to establish irreparable harm.  Id. at *11-12.  The court's instructive and persuasive reasoning bears repeating:

> Understandably, Plaintiffs are disappointed in not being able to freely access this portion of the river as they would like.  However, Plaintiffs are not denied total use of a natural resource as was the case in Rivera.  Plaintiffs have access to the Chattooga River to experience floating on the lower portion of the river and experience different ORVs [Outstanding Remarkable Values] in other areas.  Unlike the cases cited above, Plaintiffs present this court with only a partial loss of opportunity to participate in one particular activity.  Plaintiffs are not being denied the opportunity to enjoy the resource on a wholesale basis[.]

Id. at *12 (distinguishing Rivera, 910 F. Supp. 239).

necessary, such as digging a hole through the dune in an emergency situation.  PI Hrg. Tr. 224:8-15 (Watson).

Finally, even if Plaintiffs' fears of extreme ponding, flooding, and drainage problems occur, the problems can be remedied with a monetary damages award--specifically, the cost to construct and implement Mr. Walberg's proposed drainage system, as discussed above.  In the end, Plaintiffs' alleged harm, to the extent it materializes, is compensable with monetary damages.  Accordingly, for each of the foregoing reasons, the Court finds that Plaintiffs have failed to establish that they will suffer actual, imminent, and irreparable harm absent an injunction.  Any harm Plaintiffs may suffer is speculative and compensable with monetary damages.

### C. **Balance of the Harms and the Public Interest**

"In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (internal citations and quotations omitted).  Where the government is the nonmoving party, courts may consider the balancing of the harms and the public interest together.  See Nken v. Holder, 556 U.S. 418, 435 (2009) (". . . the traditional

stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.  These factors merge when the Government is the opposing party.").

Plaintiffs contend that the balance of hardship favors an injunction because Margate beach will be turned, effectively, into a "lagoon" and "junkyard" if the Project is constructed. The Court has already found that Plaintiffs have failed to meet their burden.  Defendants, on the other hand, argue that the speculative harms alleged by seven private individuals fail to outweigh the financial harms to Defendants if the Project is delayed.  Under the relevant construction contracts, Defendants must pay large monetary penalties to the contractors if construction of the Project is delayed.  Dixon Decl. ¶¶ 79-81. Plaintiffs urge the Court not to consider these financial harms to the Defendants because they are purportedly self-imposed.

Defendants also argue that construction of the Project is in the public interest and that an injunction delaying or blocking the Project's construction would, in fact, endanger the public.  The Project is designed to protect several municipalities--indeed, all of Absecon Island--from the devastating effects of storm events.  It was designed and approved by Congress to protect the residents, as well as the beaches and property, of Absecon Island, including the residents, beaches, and property of Margate.

47

The Court has considered the testimony and evidence presented by the parties, as well as the parties' briefing.  On the one hand, Defendants have established a strong public interest in the timely and cost-efficient construction of the Project.  On the other hand, Plaintiffs have failed to establish that the Project will likely create a public nuisance.  At most, Plaintiffs have set forth fears about increased drainage and ponding problems, which, while genuinely expressed, are factually unfounded.  In any case, Defendants have committed to addressing any exacerbated drainage and ponding issues that may occur after the dunes are constructed.  Accordingly, the Court finds that the speculative harms to the Plaintiffs, seven private individuals, do not outweigh the public interest in protecting all citizens, beaches, and property of Absecon Island, as well as the financial penalties that Defendants would incur if the Project were enjoined.  These factors, too, weigh heavily against the issuance of a preliminary injunction.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Application for a Preliminary Injunction [Docket No. 5] is DENIED.  An appropriate Order shall issue on this date.

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: <u>February 3, 2017</u>